UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

VIRGINIA INNOVATION
SCIENCES, INC.,

                Plaintiff,

v.                                Case No.: 2:12cv548

SAMSUNG ELECTRONICS CO.,
LTD., ET AL.,

                Defendants.

## OPINION AND ORDER

Plaintiff, Virginia Innovation Sciences, Inc. ("Plaintiff" or "VIS"), asks this Court to reconsider its January 8, 2014 summary judgment Order granting, in part, the summary judgment motion of invalidity filed by defendants, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung" or "Defendants"). ECF No. 416. Plaintiff asserts that new evidence justifies reconsideration of the summary judgment Order because, during the course of an *inter partes* review ("IPR") proceeding, the United States Patent and Trademark Office's ("PTO") Patent Trial and Appeal Board ("PTAB") issued preliminary decisions regarding institution of IPR on the patents-in-suit, with conclusions that are partially different

from this Court's summary judgment Order. The motion has been fully briefed and is therefore ripe for decision.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. General Background

At issue in this case are five[2] patents: U.S. Patent No. 7,899,492 ("the '492 patent"), U.S. Patent No. 8,050,711 ("the '711 patent"), U.S. Patent No. 8,145,268 ("the '268 patent"), U.S. Patent No. 8,224,381 ("the '381 patent"), and U.S. Patent No. 8,135,398 ("the '398 patent"). All of the patents-in-suit are continuations or continuations-in-part of the '492 patent, titled "Methods, Systems and Apparatus for Displaying the Multimedia Information from Wireless Communication Networks." The patents-in-suit address the conversion of mobile terminal multimedia signals into a format for use by an alternative display, and each of the patents-in-suit describes inventions intended to resolve the inconvenience and impracticability of viewing multimedia content on the small screens of mobile terminals.

---

[1] On April 10, 2014, the Court held a hearing on the motion for reconsideration, but the hearing focused more on issues relating to the *inter partes* review, and its effect on pending district court proceedings, than the substance of the motion to reconsider. Hr'g Tr., ECF No. 554.

[2] Previously, there were six patents at issue in this case. However, U.S. Patent No. 7,957,733 ("the '733 patent") is no longer asserted as infringed. Agreed Dismissal Order, ECF No. 408.

In the instant patent infringement action, filed on October 4, 2012, 2:12cv548 (hereinafter "VIS I"), Plaintiff alleges that Defendants have directly, indirectly, and willfully infringed the patents-in-suit by making, using, offering for sale, selling, and/or importing a wide range of accused products, including smartphones, tablets, Blu-ray players, and hubs. Pl.'s Am. Compl., ECF No. 121. Samsung denies VIS's claims of infringement and asserts several affirmative defenses, including invalidity or unenforceability of all patents-in-suit, prosecution history estoppel, and other equitable doctrines. Additionally, Samsung asserts counterclaims seeking declarations of non-infringement, invalidity, and unenforceability for each of the patents-in-suit.

On June 14, 2013, three days after the Court conducted a Markman hearing, Plaintiff filed a second patent infringement action, 2:13cv332 (hereinafter "VIS II"), alleging essentially the same causes of action as in VIS I, but with respect to Defendants' newly released products. Case No. 2:13cv332, ECF No. 1. In response, Samsung asserted essentially the same defenses and counterclaims as in VIS I. By Order of October 25, 2013, the Court joined for trial VIS I and VIS II, as the matters involve the same parties and the same patents-in-suit. ECF. No. 353. The Court then issued a new scheduling Order for the joined cases, and rescheduled the November 12, 2013 trial to

3

April 21, 2014.   Case No. 2:13cv332, ECF No. 63.   Pursuant to that scheduling Order, the parties narrowed the issues for trial and Plaintiff made its final election of claims it would assert at trial, none of which is the subject of Plaintiff's motion for reconsideration.   The April 21, 2014 trial of the two joined cases has been continued to May 27, 2014.

### B. Summary Judgment and IPR

On August 13, 2013, Defendants filed a motion for summary judgment in this Court, seeking, among other things, a ruling of invalidity as to the patents-in-suit.   On January 8, 2014, the Court ruled on Defendants' summary judgment motion in VIS I; granting, in part, and denying, in part, such motion.   ECF No. 413.   The Court found no willful infringement of any claims, and also found claims 21, 22, 25, 28, and 29 of the '268 patent, and claims 15, 60, 61 and 62 of the '398 patent, invalid as anticipated or obvious.   Id.   It is these findings of invalidity that Plaintiff asks the Court to reconsider, particularly the invalidity finding of claim 21 of the '268 patent as anticipated by prior art reference "Palin."

On September 5, 2013, at the same time VIS I and VIS II were proceeding before this Court, and while Defendant's summary judgment motion seeking a ruling of invalidity was pending, Defendants began parallel proceedings before the PTO directly challenging the validity of the patents-in-suit.   Shortly

4

thereafter, on September 16, 2013, Defendants submitted to the PTO corrected petitions seeking IPR of 37 claims from the five patents-in-suit.  Because the Director of the PTO has delegated the authority to institute IPR to the PTAB, the IPR petitions were submitted to the PTAB for consideration.  Each of the claims that Defendants asked this Court to find invalid in their August 13, 2013 summary judgment motion of invalidity were included in the 37 claims that Defendants asked the three judge panel of the PTAB to find invalid in Defendants' September 16, 2013 IPR petitions.

Although the parties to this litigation notified the PTAB of the August 13, 2013 summary judgment motion pending before this Court, neither party advised this Court of the concurrent IPR petitions or requested a stay of Court proceedings pending a decision from the PTAB.  Thus, on January 8, 2014, this Court issued its 72 page Opinion and Order ruling on the validity of the patents-in-suit without any knowledge that the exact same issues were the subject of an IPR petition pending before a three judge panel of the PTAB.

On March 6, 2014, the PTAB rendered its decisions regarding whether to instate IPR review of the five patents-in-suit, granting the request to review three of the patents ('268, '381, and '398), and denying the request to review two of the patents ('492 and '711).  Pl.'s Reconsideration Mem., Exs. 1-5, ECF No.

417. Approximately one week later, the Court was finally apprised of the IPR proceedings when Plaintiff filed its motion for reconsideration of the Court's summary judgment ruling. ECF. No. 416. Plaintiff's brief in support of its motion highlights the substantive analysis included within the PTAB's decisions and argues that such rulings constitute "new evidence that was not available prior to this Court's Summary Judgment Order." Pl.'s Reconsideration Mem. 2, ECF No. 417. Moreover, Plaintiff argues that the PTAB's decisions should be afforded deference based on the PTAB's specialized knowledge and expertise. Id. at 4.

## II. IPR AND THE DUTY OF CANDOR

Before addressing the motion to reconsider, the Court must address the IPR provisions of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), codified at 35 U.S.C. §§ 311-319, and the impact of the IPR proceedings on the district court proceedings.

### A. The IPR Procedure

The IPR procedure enacted by Congress in 2011 allows third parties to challenge a patent's validity by seeking IPR. "The IPR process set out in the AIA represents a 'new, more streamlined adjudicative proceeding' intended to replace the more cumbersome and time-consuming *inter-partes* reexamination that could take upwards of three years to conclude." Rensselaer

6

Polytechnic Institute v. Apple Inc., No. 1:13cv633, 2014 U.S. Dist. LEXIS 5186, at *5 (N.D.N.Y. Jan. 15, 2014) (hereinafter "Rensselaer") (quoting Ultratec, Inc. v. Sorenson Commc'ns, Inc., No. 13-CV-346, 2013 U.S. Dist. LEXIS 162459, at *3 (W.D. Wisc. Nov. 14, 2013)); see Abbott Labs. v. Cordis Corp., 710 F.3d 1318, 1326 (Fed. Cir. 2013) (recognizing that the AIA changed the PTO's review process from "an examinational to an adjudicative proceeding") (emphasis added). IPR "is designed to improve upon the previous inter partes re-examination process by '(1) . . . reduc[ing] to 12 months the time the PTO spends reviewing validity, from the previous reexamination average of 36.2 months; (2) . . . minimiz[ing] duplicative efforts by increasing coordination between district court litigation and inter partes review; and (3) . . . allow[ing] limited discovery in the review proceedings.'" Automatic Mfg. Sys., Inc. v. Primera Technology, Inc., No. 6:12cv1727, 2013 U.S Dist. LEXIS 165692, at *5 (M.D. Fla. November 21, 2013) (quoting Universal Elecs., Inc. v. Universal Remote Control, Inc., 943 F. Supp. 2d 1028, 1029-30 (C.D. Cal. 2013))[3] (alteration in original).

"Under the procedures governing IPR, which became effective on September 16, 2012, a request for review must be filed by the

---

[3] In Universal Electronics, the Court's summary of the improvements resulting from the new IPR procedure relied on Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48,680 (Aug. 14, 2012) (codified at 37 C.F.R. §§ 42.100 et seq.).

petitioner within one year of being served with a complaint alleging infringement of the patent in issue." Rensselaer, 2014 U.S. Dist. LEXIS 5186, at *5 (citing 35 U.S.C. § 315(b)). "On *inter partes review*, a petitioner can challenge the validity of a patent only on grounds that could be raised under 35 U.S.C. § 102 (prior art) or 35 U.S.C. § 103 (obviousness), and only then 'on the basis of prior art consisting of patents or printed publications.'" Automatic Mfg. Sys., 2013 U.S. Dist. LEXIS 165692, at *5-6 (quoting 35 U.S.C. § 311(b)). "Once an IPR petition is filed, the patent owner may submit a preliminary response within three months, or may instead expedite the process by waiving the right to submit a preliminary response." Rensselaer, 2014 U.S. Dist. LEXIS 5186, at *6 (citing 35 U.S.C. § 313; 37 C.F.R. § 42.107(b)). "An IPR trial may be initiated by the PTO if the petitioner demonstrates a reasonable likelihood of prevailing with respect to at least one challenged claim." Id. at *7 (citing 35 U.S.C. § 314(a)). "The PTO must decide whether to institute IPR within three months of the filing of the preliminary response, or, if no response is filed, [within three months of] [] the last date on which a response may be filed." Evolutionary Intelligence LLC v. Yelp Inc., No. 13-CV-3587, 2013 U.S. Dist. LEXIS 178547, at *7 (N.D. Cal. Dec. 18, 2013) (citing 35 U.S.C. § 314(b)). "The Director [of the PTO], by regulation, has delegated to the [PTAB] the authority

under section 314 to decide whether to institute an *inter partes* review." St. Jude Medical, Cardiology Div., Inc. v. Volcano Corp., No. 2014-1183, 2014 U.S. App. LEXIS 7731, at *4 n.1 (Fed. Cir. Apr. 24, 2014) (citing 37 C.F.R. §§ 42.4 & 42.108). Accordingly, when the PTAB makes "the review-instituting decision, it is exercising the Director's section 314 authority." Id.

As the Rensselaer court noted, "[u]nlike the prior *inter partes* reexamination proceeding, which was accomplished largely through submissions before a PTO examiner, IPR under the AIA is conducted before a panel of three of the technically-trained administrative judges comprising the Patent Trial and Appeal Board ('PTAB')." Rensselaer, 2014 U.S. Dist. LEXIS 5186, at *7-8 (citing 35 U.S.C. § 6(a), (c)). "On review, [this PTAB three judge panel of] the PTO can invalidate any claim before it, and the petitioner is collaterally estopped from later asserting in a civil action 'that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that *inter partes* review.'" Automatic Mfg. Sys., 2013 U.S. Dist. LEXIS 165692, at *6 (citing 35 U.S.C. § 315(e)(2)). If the "IPR is initiated, the PTAB must issue a final determination within one year after commencement, although that period may be extended, for good cause, to eighteen months." Rensselaer, 2014 U.S. Dist. LEXIS 5186, at *8 (citing 35 U.S.C. § 316(a)(11)).

Any "party dissatisfied with the PTAB's final decision may appeal the determination to the Federal Circuit." Id. (citing 35 U.S.C. § 141). "Given this timeframe, IPR can take [up to] two years before the PTO, and an appeal to the Federal Circuit can extend that timeline further." Id. Of course, IPR can also take less than two years under these timeframes, and the preclusive effect of a PTAB final determination is triggered when the PTAB issues its final written decision – regardless of whether an appeal is taken to the Federal Circuit. Compare 35 U.S.C. §§ 315(e), 318, and 319 (triggering estoppel upon issuance of PTAB final determination on IPR), with Bettcher Indus., Inc. v. Bunzl USA Inc., 661 F.3d 629, 642-47 (Fed. Cir. 2011) (triggering estoppel when all court review of inter partes reexamination determination has been exhausted).

The impact of the new IPR procedure is only beginning to be experienced. Empirical data as of April 17, 2014 reflect that, in fiscal year 2013, there were 203 decisions issued by the PTAB regarding institution of inter partes review. Patent Trial and Appeal Board, AIA Progress, http://www.uspto.gov/ip/boards/bpai/stats/041714_aia_stat_graph.pdf. Of the 203, trials were instituted in 167, 10 were joined with existing proceedings, and 26 were denied – meaning that trial was instituted in approximately 87% of the cases. Id. Thus far in fiscal year 2014, there were 335 decisions issued by the PTAB regarding

institution of *inter partes* review.   <u>Id.</u>   Of the 335, trials were instituted in 267, 1 was joined with an existing proceeding, and 67 were denied – meaning that the percentage of trials instituted dropped somewhat to approximately 80%.   <u>Id.</u>

### B.   Impact of IPR on District Court Litigation

A party simultaneously litigating a patent infringement case in federal court and an IPR proceeding before the PTAB must consider the impact of each proceeding on the other.   For example, the AIA provides that "[i]f the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for inter partes review of the patent, that civil action will be automatically stayed until either the patent owner moves the court to lift the stay, the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent, or the petitioner or real party in interest moves the court to dismiss the civil action."   60 Am. Jur. 2d <u>Patents</u> § 411 (2014) (citing 35 U.S.C. § 315(a)(2)).   However, "[a] counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent" within the meaning of 35 U.S.C. § 315(a)(2). <u>Id.</u> (citing 35 U.S.C. § 315(a)(3)).   Therefore, when an IPR petition is filed by a party to district court patent

infringement litigation involving invalidity counterclaims, the AIA does not contain a mandatory provision requiring a stay of the district court patent infringement proceedings.[4] Accordingly, the decision of whether to stay the district court proceedings in such a scenario is left to the district court's discretion – that is, if the district court knows about the IPR proceeding. See Proctor & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842, 848-49 (Fed. Cir. 2008) ("The Supreme Court has long recognized that district courts have broad discretion

---

[4] When the AIA was introduced as H.R. 1249 in the House of Representatives, it contained a section 320, describing criteria a district court should use in deciding whether to grant a stay of such litigation. However, section 320 was later omitted by amendment before the AIA was adopted. Section 320 provided that: "If a party seeks a stay of a civil action alleging infringement of a patent under section 281, or a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930, relating to an inter partes review under this chapter, the court shall decide whether to enter a stay based on (1) whether a stay, or the denial thereof, will simplify the issues in question, and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay, or the denial thereof, would unduly prejudice the non-moving party or present a clear tactical advantage for the moving party; and (4) whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court." H.R. Doc. No. 112-35 at 16 (2011). The omission of such provision from the final version of the statute means that a district court remains free to use its own discretion, and appropriate factors, in exercising its inherent power to grant or deny a stay. See Proctor & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842, 849 (Fed. Cir. 2008) (explaining that former 35 U.S.C. § 318 involving reexamination only supplemented the "inherent power of the district courts to grant a stay pending reexamination of a patent"); see also Cherokee Nation of Oklahoma v. United States, 124 F.3d 1413, 1416 (Fed. Cir. 1997) (describing balancing test for staying action); Peschke Map Techs., LLC v. J.J. Gumberg Co., Civ. Nos. 12-1525, 1527, 1528, 1530, 1572 & 1574, 2014 U.S. Dist. LEXIS 57113, at *5 (D. Del. Apr. 24, 2014) (granting stay pending PTAB inter partes review); ePlus, Inc. v. Lawson Software, Inc., No. 3:09cv620, 2010 U.S. Dist. LEXIS 31322, *5 (E.D. Va. Mar. 31, 2010) (applying stay standard in patent case involving patent reexamination).

to manage their dockets, including the power to grant a stay of proceedings.").

Here, it seems obvious to this Court that VIS and Samsung should have notified the Court that IPR petitions were filed in September 2013, and that such IPR petitions addressed the same assertions of invalidity that were then being considered by the Court. However, because counsel for both parties assert that it never occurred to them that they had a duty to notify this Court, it is necessary to review such duty and remind counsel of their obligation to the Court with respect to such duty.[5]

---

[5] During the April 10, 2014 hearing before this Court, Plaintiff stated that the failure to advise this Court of the pending PTAB proceeding was not intentional, and that counsel had never even discussed or considered whether they should advise the Court of the concurrent PTAB proceeding. Hr'g Tr. 7-8, ECF No. 554. In a post-hearing brief, VIS later stated that "Samsung raised its intention to file IPR requests when the parties met with Magistrate Judge Miller on August 29, 2013 for a settlement conference in VIS I." ECF No. 558. The Court takes the parties at their word regarding their assertions that they did not intend to conceal such PTAB proceedings when they failed to advise this Court of the IPR. However, it must be noted that the discussions that occur during settlement conferences are confidential. In order to encourage the parties to enter into candid and fulsome discussions, the district judge and magistrate judge co-assigned to cases do not discuss the substance of such settlement conferences. This policy is reflected in the Settlement Conference Order entered by Judge Miller on July 24, 2013, which provides that "[t]he undersigned will not disclose the information received during the settlement conference to anyone without the permission of the party providing the information." ECF No. 118. Moreover, E.D. Va. Loc. Civ. Rule 83.6(e) describes the rules governing mediation, including settlement conferences, and provides that "[t]he substance of communications in the mediation process shall not be disclosed to any person other than participants in the mediation process."

## 1. Duty of Candor and Good Faith

This Court has adopted a local rule regarding the ethical standards applicable to cases before the Court. It provides that "[t]he ethical standards relating to the practice of law in civil cases in this Court shall be Section II of Part Six of the Rules of the Virginia Supreme Court as it may be amended or superseded from time to time." E.D. Va. Loc. Civ. R. 83.1. Rule 3.3 of those Rules of Professional Conduct is entitled "Candor Toward The Tribunal." Va. Rule Prof'l Conduct 3.3. Subsection (a)(2) of that Rule provides that "[a] lawyer shall not knowingly . . . fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." Id. Comment 1 to the Rule observes that "[t]he advocate's task is to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client is qualified by the advocate's duty of candor to the tribunal." Id. Comment 3 to the Rule, entitled "Representations by a Lawyer," further provides that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." Id. In addition to the Rule 3.3 duty of candor, there is also a broader general duty of candor and good faith that encompasses an attorney's duty to advise a district court of any development that may affect the outcome of the

14

litigation. United States v. Shaffer Equip. Co., 11 F.3d 450, 457-59 (4th Cir. 1993). These general principles, and the relationship between this general duty to advise and the Rule 3.3 duty of candor, have been discussed at length by the United States Court of Appeals for the Fourth Circuit.

In the following passage from Shaffer Equipment,[6] the Fourth Circuit explained how these two duties apply:

> It appears that the district court, in finding that the government's attorneys violated a duty of candor to the court, applied the general duty of candor imposed on all attorneys as officers of the court, as well as the duty of candor defined by Rule 3.3. Although the court referred to Rule 3.3, it also described the duty of candor more broadly as that duty attendant to the attorney's role as an officer of the court with a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." [United States v. Shaffer Equip. Co., 796 F. Supp. 938, 950 (S.D. W. Va. 1992).] It concluded, "Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case." Id. In its brief, the government did not address the existence, nature, and scope of any general duty of candor and whether its attorneys violated that duty. Nevertheless, we are confident that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court.
>
> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for

---

[6] In Shaffer Equipment, the district court found that government attorneys breached their duty of candor in their efforts to recover the EPA's costs of cleaning up a hazardous waste site. The EPA on-site coordinator misrepresented his academic achievements and credentials and the government's attorneys wrongfully obstructed the defendants' efforts to "root out the discrepancies and failed to reveal them once they learned of them." 11 F.3d 450, 452.

the purpose of dispensing justice.   However, because
no one has an exclusive insight into truth, the
process depends on the adversarial presentation of
evidence, precedent and custom, and argument to
reasoned conclusions--all directed with unwavering
effort to what, in good faith, is believed to be true
on matters material to the disposition.   Even the
slightest accommodation of deceit or a lack of candor
in any material respect quickly erodes the validity of
the process.   As soon as the process falters in that
respect, the people are then justified in abandoning
support for the system in favor of one where honesty
is preeminent.

While no one would want to disagree with these
generalities about the obvious, it is important to
reaffirm, on a general basis, the principle that
lawyers, who serve as officers of the court, have the
first line task of assuring the integrity of the
process.   Each lawyer undoubtedly has an important
duty of confidentiality to his client and must surely
advocate his client's position vigorously, but only if
it is truth which the client seeks to advance. The
system can provide no harbor for clever devices to
divert the search, mislead opposing counsel or the
court, or cover up that which is necessary for justice
in the end.   It is without note, therefore, that we
recognize that the lawyer's duties to maintain the
confidences of a client and advocate vigorously are
trumped ultimately by a duty to guard against the
corruption that justice will be dispensed on an act of
deceit.   See 1 Geoffrey C. Hazard, Jr. and W. William
Hodes, The Law of Lawyering 575-76 (1990) ("Where
there is danger that the tribunal will be misled, a
litigating lawyer must forsake his client's immediate
and narrow interests in favor of the interests of the
administration of justice itself.").

While Rule 3.3 articulates the duty of candor to the
tribunal as a necessary protection of the decision-
making process, see Hazard at 575, and Rule 3.4
articulates an analogous duty to opposing lawyers,
neither of these rules nor the entire Code of
Professional Responsibility displaces the broader
general duty of candor and good faith required to
protect the integrity of the entire judicial process.
The Supreme Court addressed this issue most recently

in <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991). There, an attorney had taken steps to place certain property at issue beyond the jurisdiction of the district court and had filed numerous motions in bad faith, simply to delay the judicial process. The district court, the court of appeals, and the Supreme Court all agreed that neither Federal Rule of Civil Procedure 11 (subjecting to sanction anyone who signs a pleading in violation of the standards imposed by the rule) nor 28 U.S.C. § 1927 (subjecting to sanction anyone who "multiplies the proceedings . . . unreasonably and vexatiously") could reach the conduct. However, the Supreme Court accepted the district court's reliance on the inherent power to impose sanctions, rejecting arguments that Rule 11 and § 1927 reflect a legislative intent to displace a court's power to vacate a judgment upon proof that a fraud has been perpetrated upon the court:

> We discern no basis for holding that the sanctioning scheme of the statute [28 U.S.C. § 1927] and the rules displaces the inherent power to impose sanctions for the bad faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

[<u>Chambers</u>,] 501 U.S. at [46,] 111 S. Ct. at 2134 (emphasis added).

The general duty of candor and truth thus takes its shape from the larger object of preserving the integrity of the judicial system. For example, in <u>Tiverton Board of License Commissioners v. Pastore</u>, 469 U.S. 238, 83 L. Ed. 2d 618, 105 S. Ct. 685 (1985), counsel failed to apprise the Supreme Court that during the appeal process, one of the respondents, a liquor store challenging the admission of evidence at a Rhode Island liquor license revocation proceeding,

had gone out of business, rendering the case moot. Rebuking counsel for failing to comply with a duty of candor broader than Rule 3.3, the Supreme Court stated, "It is appropriate to remind counsel that they have a 'continuing duty to inform the Court of any development which may conceivably affect the outcome' of the litigation." Id. at 240 (quoting Fusari v. Steinberg, 419 U.S. 379, 391, 42 L. Ed. 2d 521, 95 S. Ct. 533 (1975) (Burger, C.J. concurring)) (emphasis added).

The general duty to preserve the integrity of the judicial process was similarly identified in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 88 L. Ed. 1250, 64 S. Ct. 997 (1944). Without the support of any rule, the Court opened up a long-standing judgment because one of the litigants had introduced a document at trial which was later discovered to be fraudulent.   The Supreme Court stated,

> It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants.  The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

Id. at 246 (emphasis added).

Shaffer Equip., Co., 11 F.3d at 457-59; see also Aptix Corp. v. Quickturn Design Sys., Inc., 269 F.3d 1369, 1379 (Fed. Cir. 2001) ("The duty of candor to the court is entitled to at least as much honor as that to the PTO.") (Mayer, C.J., dissenting).

## 2. Duty of Candor - Related Proceedings

This general and rule-based duty of candor finds application, among other places, in cases where two related matters are being adjudicated without counsel notifying each adjudicator of the related matter. A patent infringement suit with an invalidity counterclaim, and an IPR proceeding involving the validity of the same patent claims, fit into that category of related matters requiring notification to the respective adjudicative tribunals. At least one other court has found the duty of candor applicable in such circumstances. Rensselaer, 2014 U.S. Dist. LEXIS 5186, at *16. In Rensselaer, the district court explained that "[w]hile Apple filed its IPR petition on October 21, 2013, it was not until December 9, 2013, that it requested permission to bring the instant motion [to stay], which was filed on December 23, 2013." Id. The court noted that in the interim, Apple had participated in a telephone conference with the court and "neglected to inform the court and plaintiffs that it had submitted an IPR petition to the PTO." Id. The Rensselaer court also noted that, during a hearing on the motion to stay, "Apple did not offer a particularly persuasive reason for its lack of candor with the court and plaintiffs during the telephone conference regarding the fact that it had filed an IPR petition." Id. (emphasis added).

19

In addition to such directly analogous case, federal courts in non-patent cases have long-recognized the existence of a duty of candor when related cases are simultaneously pending in different courts.    In Cleveland Hair Clinic, Inc. v. Puig, 200 F.3d 1063, 1067-68 (7th Cir. 2000), an attorney appearing before a federal district court failed to disclose a state lawsuit he had prepared and was having simultaneously filed.    Noting the Supreme Court's admonition that counsel have a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation, Pastore, 469 U.S. at 240, and the Illinois Rule 3.3 duty of candor, the Seventh Circuit observed that "[t]he goal of the state lawsuit was to cut off the federal court at the pass, a development that surely could have affected the outcome of the litigation pending in federal court." Cleveland Hair Clinic, 200 F.3d at 1067-68.

In another case involving related litigation, Calleros v. FSI Int'l, Inc., 892 F. Supp. 2d 1163, 1165 (D. Minn. 2012), the plaintiff shareholder filed a suit in federal district court alleging that the defendant corporation, its officers, and directors, violated the Securities Exchange Act and their fiduciary duties by mailing incomplete and misleading disclosures in connection with a proposed tender offer by another company.    However, the plaintiff shareholder failed to advise the district court that another shareholder had filed a

class-action suit in state court alleging that the same corporation's officers and directors violated their fiduciary duties by making incomplete and misleading disclosures in connection with the proposed transaction, and that two other similar state court class actions had also been filed. Id. at 1166. The district court noted that "[t]ellingly absent from [plaintiff's] Motion papers is any reference to the state-court cases raising nearly identical issues to the instant action." Id. at 1167. In deciding to stay its proceedings in favor of the related state court litigation, the district court observed that it was "troubled by the failure to mention the related state-court litigation," since "'[a]ttorneys, as officers of the court, have the responsibility to present the record with accuracy and candor.'" Id. at 1168 n.6 (quoting Pinkham v. Sara Lee Corp., 983 F.2d 824, 826 (8th Cir. 1992)). The district court concluded that "[i]t seems fairly apparent that counsel have flouted that obligation here." Id.; see also Perez v. Sanford-Orlando Kennel Club, Inc., 518 F.3d 1302, 1303 (11th Cir. 2008) (admonishing an attorney who failed to advise court of potentially jurisdiction-stripping events taking place before oral argument and then asking court to vacate opinion after losing his case).

This duty has also been applied in a non-patent context where there were federal district court proceedings and related

administrative proceedings pending at the same time.   In U.S.
Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.,
540 F. Supp. 2d 994 (N.D. Ill. 2008) (hereinafter "Lake Shore"),
the district court was faced with a situation involving a
simultaneous administrative proceeding of which it was not
informed.   The district court, in a futures trading matter, had
granted plaintiff's request for a statutory restraining order
freezing defendant's assets, which order was later vacated by
the Seventh Circuit's mandate.   Id. at 996-97.   "During this
time period, unbeknownst to the court, the National Futures
Association ("NFA"), which is not a party to this action, was
working to freeze Lake Shore Ltd.'s assets via a completely
different route by filing a member responsibility action
("MRA")."   Id. at 997.   Shortly after the Seventh Circuit
vacated the district court's order, the NFA issued an asset
freeze, which the district court learned of the same day when
Lake Shore Ltd. filed an "emergency motion to enforce mandate."
Id.   The motion alleged that the federal statutorily-established
NFA administrative action, which Lake Shore Ltd. had never
previously mentioned to the district court or the Seventh
Circuit, had been issued in violation of the Seventh Circuit's
mandate and opinion.   Id.   The district court's opinion
summarizing these events relied on both Cleveland Hair Clinic
and Pastore in noting that it was "unclear why none of the

22

lawyers in this case told the court about the NFA member responsibility action prior to the issuance of the NFA asset freeze order, given that the preliminary injunction sought to freeze the very same assets at issue in the NFA action." Id. at 997 n.1.

### 3. Application of Duty of Candor to this Case

The context in which this Court learned of the related IPR litigation was slightly different from that in Rensselaer, and similar to that in Lake Shore, in that both VIS and Samsung knew of the September 2013 filing of the IPR petition, but neither of them informed the Court for six months. It was not until the PTAB ruled on institution, and VIS filed its motion to reconsider, that the Court was made aware of such concurrent proceeding. Of course, at the same time that Defendants were petitioning the PTAB for an adjudication of the validity of the patents at issue in this case, and Plaintiff was actively opposing such petitions, Defendants were also asking this Court to adjudicate the validity of the same patents and Plaintiff was actively opposing such efforts.

At the April 10, 2014 hearing before this Court on the motion to reconsider, the Court raised the issue of the parties' failure to notify the Court that they had begun the IPR proceeding. Hr'g Tr., ECF. No. 554. Counsel for each of the parties responded that it never occurred to them that they

should advise this Court of such parallel proceeding. Even after the Court noted that the AIA provides that, after a final written decision by the PTAB, a petitioner is collaterally estopped from later asserting in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the *inter partes* review, Defendants seemed to suggest that they did not think to notify this Court of the IPR proceeding because this Court's docket moved so quickly. Hr'g Tr. 13, ECF No. 554.

The existence of such a parallel proceeding normally comes to the attention of the Court through one of the parties filing a motion to stay court proceedings in light the request for institution of IPR. See Universal Elecs., Inc., 943 F. Supp. 2d at 1030 (considering such a stay motion). However, that did not take place here. Had the parties promptly notified this Court of the pending petition, then the Court at least could have considered for itself what impact such related proceeding might have on the scheduling of matters,[7] as well as whether it wished to stay the proceedings and its then-ongoing consideration of Defendants' summary judgment motion of invalidity. After all, "[a] stay is particularly appropriate, and within the court's 'sound discretion,' where the outcome of another case may

---

[7] Had the Court known of the pending IPR proceeding on October 25, 2013, when it rescheduled the trial from November 12, 2013 to April 21, 2014, it could have factored such knowledge into its scheduling decision.

'substantially affect' or 'be dispositive of the issues' in a case pending before a district court." <u>MEI, Inc. v. JCM Am. Corp.</u>, Civ. No. 09-351, 2009 U.S. Dist. LEXIS 96266, at *12-13 (D.N.J. Oct. 15, 2009) (quoting <u>Bechtel Corp. v. Local 215, Laborers' Int'l Union of North America</u>, 544 F.2d 1207, 1215 (3rd Cir. 1976)); see <u>Brixham Solutions Ltd. v. Juniper Networks, Inc.</u>, Civ. No. 13-cv-616-JCS, 2014 U.S. Dist. LEXIS 58770, at *3-7 (N.D. Cal. April 28, 2014) (granting motion to stay patent infringement suit involving non-practicing entity pending *inter partes* review); see also <u>Gould v. Control Laser Corp.</u>, 705 F.2d 1340, 1341 (Fed. Cir. 1983) (discussing trial court stay of patent infringement litigation during reexamination proceedings). Moreover, such stays may be initiated <u>sua sponte</u>. See <u>Crown Cent. Petroleum Corp. v. Dep't of Energy</u>, 102 F.R.D. 95, 98 (D. Md. 1984) ("A federal court has inherent power to stay, <u>sua sponte</u>, an action before it.") (citing <u>Landis v. North Am. Co.</u>, 299 U.S. 248, 254-55 (1936)). And while, as Plaintiff has frequently noted, it is true that trials resolve cases, it is also true that a "final written decision" from the PTAB has preclusive effect and should therefore resolve cases. See 35 U.S.C. §§ 315(e), 318, and 319.

By failing to advise this Court of the existence of the IPR proceedings, VIS and Samsung in effect had two bites at the apple regarding the validity of the disputed claims. Moreover,

they deprived this Court of the opportunity to inquire of the parties and decide for itself whether to await a ruling from the PTAB on that issue.  As the PTO noted in issuing its new rules of practice implementing the AIA, it was "anticipated that the rules will minimize duplication of efforts. . . .  By requiring the filing of an *inter-partes* review petition earlier than a request for *inter-partes* reexamination, and by providing shorter timelines for *inter-partes* review compared with reexamination, it is anticipated that the current high level of duplication between litigation and reexamination will be reduced."  77 Fed. Reg. 48680, 48721.  Needless to say, the practice adopted by the parties does not lend itself to promoting judicial efficiency or accomplishing some of the purposes Congress obviously intended with enactment of the AIA.  Moreover, such practice may work a hardship on an entire district that seeks to expeditiously resolve its docket.

The parties should have notified this Court of the IPR petition as soon as it was filed, and the failure to do so appears, at least to the undersigned Judge, to have been a glaring omission.  By not notifying the Court, counsel have, at the very least, failed to comply with their general duty of candor and good faith to this Court because the IPR proceeding was clearly a "development which may conceivably affect the outcome of the litigation" - a fact best demonstrated by

Plaintiff's filing of the motion for reconsideration.  Pastore, 469 U.S. at 240.[8]  However, in light of the undeveloped state of the law on this relatively new PTO review procedure, this Court's admonition of all counsel involved in this case falls short of a formal reprimand of any of the individual lawyers.[9] That said, the issuance of this Opinion is more than sufficient to place all patent practitioners on notice that future failures to disclose to the Court any concurrent inter partes review proceedings will be met with far sharper consequences.

Like the Lake Shore court, this Court "takes its obligation to promote civility and collegiality between the bench and bar very seriously," and only "prepared this opinion after a great deal of reflection." Lake Shore, 540 F. Supp. 2d at 996. However, the Court "cannot turn a blind eye to conduct that negatively impacts its ability to promote the orderly administration of justice and resolve disputes fairly." Id.  It

---

[8] In light of the Court's conclusion regarding the general duty of candor, it is not necessary for this Court to engage in further analysis regarding the Rule 3.3 duty of candor.

[9] Although the replacement of inter partes reexamination by inter partes review effected a transformation from an examinational to an adjudicative proceeding, thus making the existence of concurrent PTO review proceedings more similar to the concurrent litigation cases discussed above, the prior reexamination process was still a related administrative proceeding that could "conceivably affect the outcome of the litigation." Pastore, 469 U.S. at 240. Accordingly, although the question is not squarely before this Court, there is a strong argument that even under the old inter partes reexamination process, the general duty of candor required parties to notify the Court of the filing of a petition for reexamination.

is this Court's hope that shining light on this issue will remind counsel in this case, and others, of their continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation. Pastore, 469 U.S. at 240. The Court now moves on to address the standard applicable to the motion to reconsider, as well as the substance of such motion.

### III. STANDARD OF REVIEW - RECONSIDERATION

Because the motion for reconsideration is a procedural matter not unique to patent law, when considering such a motion, this Court looks to controlling Fourth Circuit precedent, rather than Federal Circuit precedent. Bowling v. Hasbro, 403 F.3d 1373, 1375 (Fed. Cir. 2005); Pennington Seed, Inc. v. Produce Exchange No. 299, 457 F.3d 1334, 1340 n.2 (Fed. Cir. 2006). Controlling Fourth Circuit law clearly provides that a summary judgment order, like the January 8, 2014 summary judgment Order at issue, "which did not resolve all claims against all parties, was interlocutory and thus subject to revision at any time." Saint Annes Dev. Co., Inc. v. Trabich, 443 F. App'x 829, 832 (4th Cir. 2011) (citing Fed. R. Civ. P. 54(b)). While final orders trigger heightened standards for reconsideration, see Fed. R. Civ. P. 59(e) and 60(b), interlocutory orders, such as orders of partial summary judgment, are not subject to those strict standards because "'[a] district court retains the power

to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.'" Saint Annes Dev. Co., 443 F. App'x at 832 (quoting American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003)); see Fed. R. Civ. P. 54(b) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of [final] judgment"); Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1469 (4th Cir. 1991) (same). The differing standards for interlocutory versus final orders are understandable, as significant time and resources are often invested in arriving at a final judgment. American Canoe Ass'n, 326 F.3d at 514.

The power to reconsider an interlocutory ruling "is committed to the discretion of the district court, . . . and doctrines such as law of the case . . . have evolved as a means of guiding that discretion." Id. at 515 (citing Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 12 (1983), Sejman v. Warner-Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir. 1988)). A court's earlier decisions become law of the case and must generally be followed unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous

29

and would work manifest injustice." Sejman, 845 F.2d at 69 (internal quotation marks omitted); see American Canoe Ass'n, 326 F.3d at 515 (explaining that although it is the "ultimate responsibility of [all levels of] the federal courts . . . to reach the correct judgment under law, . . . that obligation may be tempered at times by concerns of finality and judicial economy").

The law of the case doctrine, which guides this Court's reconsideration decision, "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." Sejman, 845 F.2d at 68-69 (citations omitted). "As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988) (internal citation and quotation marks omitted). The doctrine is "basically [a] simple principle of disciplined self-consistency" based on principles of finality and comity, as opposed to a lack of authority.[10]   18B Wright, Miller & Cooper, Federal Practice

---

[10] "The force of law-of-the-case doctrine is affected by the nature of the first ruling and by the nature of the issues involved. If the ruling is avowedly tentative or the issues especially important, it may be said that law-of-the-case principles do not apply.  Different parties in separate proceedings likewise may fall outside law-of-the-case constraints . . . .  Matters of fact, on the other hand, are unlikely candidates for reconsideration after the first full effort."

and Procedure: Jurisdiction § 4478 (2d ed. 2002). Stated differently, "[l]aw-of-the-case principles . . . are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards." Id.; see Christianson, 486 U.S. at 816 n.5 ("Perpetual litigation of any issue . . . delays, and therefore threatens to deny, justice."). It is a simple but unavoidable reality that district courts could not effectively and efficiently satisfy their responsibilities if every ruling were open to reconsideration based on better crafted legal argument. See Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc., No. 3:05cv355, 2006 WL 5908727, at *8 (E.D. Va. Feb. 10, 2006) ("Courts will not typically reconsider an interlocutory order where the motion to reconsider simply seeks 'to present a better and more compelling argument that the party could have presented in the original briefs.'" (quoting Madison River Mgmt. Co. v. Business Mgmt. Software Corp., 402 F. Supp. 2d 617, 619 (M.D.N.C. 2005))); 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.1 (2d ed. 2002) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment."); see also Sejman, 845 F.2d

---

18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.5 (2d ed. 2002).

at 69 ("Clearly, courts could not perform their duties
'satisfactorily and efficiently . . . if a question once
considered and decided . . . were to be litigated anew'" in
subsequent appeals. (quoting Great Western Tel. Co. v. Burnham,
162 U.S. 339, 344 (1896))).

Of course, "[a] court has the power to revisit prior
decisions of its own or of a coordinate court in any
circumstance, although as a rule courts should be loathe to do
so in the absence of extraordinary circumstances such as where
the initial decision 'was clearly erroneous and would work a
manifest injustice.'" Christianson, 486 U.S. at 817 (quoting
Arizona v. California, 460 U.S. 606, 618 n.8 (1983)). In line
with Christianson, the Fourth Circuit has expressly recognized
that a court may "depart[] from the law of the case when [a]
previous decision [i]s 'clearly erroneous and would work
manifest injustice.'" TFWS, Inc. v. Franchot, 572 F.3d 186, 192
(4th Cir. 2009) (quoting United States v. Aramony, 166 F.3d 655,
661 (4th Cir. 1999)). In applying such exception to the law of
the case doctrine, the Fourth Circuit explained that "[a] prior
decision does not qualify for this . . . exception by being just
maybe or probably wrong; it must strike us as wrong with the
force of a five-week-old, unrefrigerated dead fish." Id. at 194
(internal citations and quotation marks omitted). In other
words, "[i]t must be 'dead wrong.'" Id. (citations omitted).

Accordingly, having determined that the above-described discretionary standard for reconsideration is the correct standard in the instant circumstances, the Court turns to the substantive analysis of the issues raised in the parties' briefs.

## IV. DISCUSSION

Plaintiff's motion seeking reconsideration asserts that this Court should consider the recent PTAB decisions regarding institution to be "new evidence" and should give deference to the PTAB's findings due to the specialized knowledge and expertise of the PTO. Pl.'s Reconsideration Mem. 4, ECF No. 417 (citing PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008). Defendants respond by arguing that the Court need not accord the decisions by the PTAB deference because "a decision by the USPTO that claims are valid over prior art is 'never binding on the court.'" Defs.' Opp. Mem. 7, ECF No. 465 (quoting Interconnect Planning Corp. v. Feil, 774 F. Supp. 2d 1132, 1139 (Fed. Cir. 1985) (emphasis added by Defendants). Defendants further assert that no deference should be accorded the PTAB's decisions because they are only decisions regarding whether to institute IPR, not final decisions after PTAB adjudication. Moreover, Samsung argues that even these preliminary decisions to institute IPR, or not to institute IPR, are initial rulings subject to rehearing. Id. at 7-8. VIS

33

replies by asserting that its position is not that the PTAB rulings are <u>binding</u> on this Court, but that they should be afforded deference as a matter of law.   Pl's Rebuttal Mem. 2, ECF No. 475 (citing <u>Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.</u>, 725 F.2d 1350, 1359 (Fed. Cir. 1986) <u>abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.</u>, 649 F.3d 1276, 1288-90 (Fed. Cir. 2011) (en banc)).

These assertions by Plaintiff seem to rely on the first two <u>Sejman</u> factors that our Court of Appeals directs district courts to utilize in deciding whether to reconsider an interlocutory ruling.   <u>Sejman</u>, 845 F.2d at 69.   However, the first of the three <u>Sejman</u> factors described above is not present in this case because no "subsequent trial produce[d] substantially different evidence" such that this Court should not follow its earlier decision.   <u>Id.</u>   No trial has taken place in <u>this</u> case.   <u>See Lincoln Nat'l Life Ins. Co. v. Roosth</u>, 306 F.2d 110, 113 (5th Cir. 1962) (clearly referencing subsequent trial in same case as original decision in describing factor <u>Sejman</u> adopted).   Therefore, there is no different evidence produced by "a trial" in <u>this</u> case.   Moreover, even if the Court were to broadly construe the submission to the Court of the PTAB decisions as falling within the ambit of the first <u>Sejman</u> factor, such PTAB decisions still do not satisfy the first factor.   As discussed more fully below, a decision on IPR institution is merely a

34

threshold determination as to whether, using the broadest reasonable interpretation of the claim terms, the petitioner has demonstrated that there is a reasonable likelihood of the patent claims being found invalid by a preponderance of the evidence. 37 C.F.R. § 542.100(b); 35 U.S.C. § 314(a); 35 U.S.C. § 316.  As such, it is not a "trial" producing "evidence."

## A. Deference Owed to PTAB's Decisions

Having determined that there is no subsequent trial producing substantially different evidence, the Court moves on to the second Sejman factor, and asks whether controlling authority has since made a contrary decision of law applicable to the issue at hand, such that the Court should not follow its earlier decision.  Sejman, 845 F.2d at 69.  PTO decisions regarding patentability can have a direct effect on pending litigation because the power to grant a patent is not one afforded to the courts, but is strictly within the domain of the PTO.  See Patlex Corp. v. Mossinghoff, 758 F.2d 594, 604 on reh'g, 771 F.2d 480 (Fed. Cir. 1985) ("Validity often is brought into question in disputes between private parties, but the threshold question usually is whether the PTO, under the authority assigned to it by Congress, properly granted the patent.  At issue is a right that can only be conferred by the government." (citing Crowell v. Benson, 285 U.S. 22, 50 (1932))).  The Court therefore generally gives deference to

35

final PTO decisions, based in part on the PTO's specialized knowledge and expertise. See PowerOasis, Inc., 522 F.3d at 1304 (indicating that when the validity of an issued patent is challenged, and "'no prior art other than that which was [originally] considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.'" (quoting Am. Hoist & Derrick Co., 725 F.2d at 1359-60)). Moreover, the Court is required to give a certain level of deference to the PTO based on 35 U.S.C. § 282, which provides that a duly issued patent is presumed valid, and the Federal Circuit has recognized that such "statutory presumption derives in part from recognition of the technological expertise of the patent examiners." Interconnect Planning Corp., 774 F.2d at 1139.

Notwithstanding such presumption and the associated deference, when the validity of a patent is challenged in federal court, a district court has "the obligation . . . to reach an independent conclusion," regarding validity, and a prior decision by a patent examiner, whether it be on an

36

original patent application or a reissue application, "'is never binding on the court.'" Id. (quoting Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1555 (Fed. Cir. 1985)). Rather, the examiner's decision is merely "'evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence.'" Id. (quoting Fromson, 755 F.2d at 1555).

In light of the fact that prior final PTO decisions affirming patentability are not controlling in a subsequent validity challenge in this Court, a decision by the PTO regarding whether to institute IPR certainly does not have binding effect on the Court. Moreover, even if the Court assumes that a prior final PTAB decision as to patentability, could somehow be binding on a district court, such rule surely would not make subsequent non-final PTAB decisions to institute, or not to institute IPR proceedings, retroactively binding on a district court. Accordingly, while the Court has the discretion to consider the recent PTAB rulings, they are not "controlling authority" reaching a decision contrary to this Court's decision, Sejman, 845 F.2d at 69, and the Court is therefore certainly not required to overturn its prior decision based on the analysis in a decision by the PTAB granting or denying institution of IPR.

## B. Impact of Differing Standards at PTAB and the Court

The Court now moves on to consider the third and final Sejman factor, asking whether its "prior decision was clearly erroneous and would work manifest injustice." Sejman, 845 F.2d at 69. Any deference this Court might decide to accord PTAB analysis in determining whether the Court's prior decision was clearly erroneous and would work manifest injustice, such that it required reconsideration of the summary judgment Order, is tempered by the contrast between the claim constructions and other legal standards used by the PTAB and those used by this Court. In determining whether to institute IPR, the PTAB must determine whether, using the broadest reasonable interpretation of the claim terms, the petitioner has demonstrated that there is a reasonable likelihood of the patent claims being found invalid by a preponderance of the evidence.    37 C.F.R. § 42.100(b); 35 U.S.C. § 314(a); 35 U.S.C. § 316.   In contrast, when construing a disputed patent's claim terms, the Court adopts a construction based on what a person having ordinary skill in the relevant art would understand the claims to mean as of the time of invention. Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005).    Once the claim terms have been construed, the Court determines whether the claims have been proven invalid by clear and convincing evidence.   Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2246 (2011).

Indeed, the PTAB recognized these differing standards when it granted VIS's motion to submit to the PTAB this Court's January 8, 2014 summary judgment Order. The PTAB stated that "[a]lthough the district court's order may be informative, the Board applies a claim construction standard that may not be the same as that adopted by a district court, and the Board may reach a different result." Feb. 12, 2014 PTAB Order, Paper No. 12, Case Nos. IPR2013-00569, IPR2013-00570, IPR2013-00571; February 12, 2014 Order by PTAB, Paper No. 13, Case Nos. IPR2013-00572, IPR2013-00573. Thus, it is not surprising that in construing the specific claim term, "converted video signal," the term upon which VIS rests its entire argument for reconsideration, the PTAB reached a claim construction meaningfully different from the construction adopted by this Court in its Markman Opinion. Markman Opinion 52, ECF No. 198 (giving the term "converted video signal" its plain and ordinary meaning, which is "a video signal that has been changed."); Summary Judgment Order 17, ECF No. 413 (reaffirming the Court's construction of the term in its Markman Opinion); cf. Pl's Reconsideration Mem. Ex. 1 at 15, ECF No. 417-2 (reflecting the PTAB's definition of "convert" as "to change the representation of data from one form to another").[11]

---

[11] Furthermore, VIS's attempt to argue that the claim constructions reached by the PTAB and the Court are consistent, Pl's Rebuttal Mem.

As the PTAB applied a different claim construction standard, and different standards of law, to reach its differing decision as to whether a specific prior art reference would likely disclose the claim limitation of a "converted video signal," VIS has failed to show that this Court's prior ruling on summary judgment was clearly erroneous or that it would work a manifest injustice if it is not revised. Sejman, 845 F.2d at 69; Franchot, 572 F.3d at 192 (quoting Aramony, 166 F.3d at 661).

Moreover, Plaintiff's attempt to get a second bite at the apple of invalidity, by arguing that this Court's earlier decision was clearly erroneous, undermines the principles of finality and comity on which the law of the case doctrine is grounded. The arguments and evidence presented to the PTAB, which were different than the arguments and evidence presented to this Court, necessarily informed the PTAB analysis and the conclusions which Plaintiff argues the Court should now adopt. However, the Court may not adopt the record presented to a

---

4, ECF No. 475, when they clearly are not, is merely an argument for a new claim construction in this case different from the construction which VIS argued for during the Markman process and which the Court subsequently adopted in its Markman Opinion.   It is well-settled that "one cannot interpret a patent one way for the validity analysis and a different way for the infringement analysis."  A. G. Design & Assocs. LLC v. Trainman Lantern Co., Inc., 271 F. App'x 995, 999 n.4 (Fed. Cir. 2008); see Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a "nose of wax," be twisted one way to avoid anticipation and another to find infringement.") (quotation marks and citation omitted).

separate tribunal for the facts therein.   See <u>United States v.</u>
<u>Jones</u>, 29 F.3d 1549, 1553 (11th Cir. 1994) (recognizing that a
"'court may take judicial notice of a document filed in another
court <u>not for the truth of the matters asserted</u> in the other
litigation, but rather to establish <u>the fact of such litigation</u>
and related filings.'" (quoting <u>Liberty Mut. Ins. Co. v. Rotches</u>
<u>Pork Packers, Inc.</u>, 969 F.2d 1384, 1388 (2d Cir. 1992)); <u>United</u>
<u>States v. Rosga</u>, 864 F. Supp. 2d 439, 447 (E.D. Va. 2012)
("Thus, for example, a court may 'notic[e] the content of court
records,' <u>Colonial Penn Ins. Co. v. Coil</u>, 887 F.2d 1236, 1239
(4th Cir. 1989), but 'only for the limited purpose of
recognizing the "judicial act" that the order represents or the
subject matter of the litigation.'" <u>Jones</u>, 29 F.3d at 1553).
Additionally, Plaintiff does not assert that the evidence
presented to the PTAB by the parties to this litigation was
unavailable at the time VIS filed its briefs on summary judgment
regarding validity.   Rather, Plaintiff only asserts that the
PTAB had not yet rendered a decision favorable to VIS at the
time it submitted its summary judgment briefs in this case.
Pl's Reconsideration Mem. 2, ECF No. 417.

To allow reconsideration of an interlocutory order based
upon the <u>subsequent</u> decision of another adjudicative tribunal —
which was driven by a different claim construction, different
arguments by the parties, different evidence, and a different

legal standard — would remove all considerations of finality and consistency by allowing parties to challenge a court's ruling whenever that party identifies, in hindsight, an improved legal argument. See Hilb Rogal & Hobbs Co., 2006 WL 5908727, at *8 ("Courts will not typically reconsider an interlocutory order where the motion to reconsider simply seeks 'to present a better and more compelling argument that the party could have presented in the original briefs.'" (quoting Madison River Mgmt. Co., 402 F. Supp. 2d at 619)); 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.1 (2d ed. 2002) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment."); see also Sejman, 845 F.2d at 69 ("Clearly, courts could not perform their duties 'satisfactorily and efficiently . . . if a question once considered and decided . . . were to be litigated anew'" in subsequent appeals. (quoting Great Western Tel. Co., 162 U.S. at 344)).

Finally, even if the Court reconsidered its prior summary judgment order in light of the PTAB's decisions regarding institution of IPR, the Court would arrive at the same conclusions. In its Markman Opinion, the Court adopted the construction of the term "converted video signal" proposed by VIS, and, based on what a person having ordinary skill in the

42

art would understand the claims to mean at the time of invention, gave the term its ordinary and plain meaning — "a video signal that has been changed." <u>Markman</u> Opinion at 44 & 52, ECF No. 198. Therefore, when analyzing the asserted claims of the '268 patent for validity in light of the prior art reference "Palin," the Court used this construction of the term "converted video signal." In contrast to this Court's claim construction, the PTAB applied the "broadest reasonable interpretation" standard to the differing evidence and argument before it and adopted a construction of the term "converted video signal" which defined "convert" as "to change the representation of data from one form to another, for example to change numerical data from binary to decimal or from cards to tape." Pl.'s Reconsideration Mem., Ex. 1 at 15, ECF No. 417-1. Applying the construction adopted by this Court, and <u>not</u> the contrary construction adopted by the PTAB, the Court is confident that its decision in the original summary judgment Order was the correct one. The prior art reference "Palin" discloses a video signal which has been changed and, thus, anticipates the claim term of a "converted video signal." <u>See</u> Summary Judgment Order at 29-30, ECF No. 413. That the PTAB arrived at a different conclusion when using a different claim construction does not serve to prove the Court's conclusion

erroneous.[12]

For the reasons stated above, although this Court plainly has authority to reconsider the summary judgment Order, it declines to do so, based on considerations of finality, consistency, and comity, as well as the procedural posture of this case. Accordingly, Plaintiff's motion for reconsideration of the Court's summary judgment Order, ECF No. 416, is **DENIED**.

### V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Reconsideration is **DENIED**. The Court reiterates for the benefit of counsel in this case, and counsel in all future patent cases, that a lawyer's general duty of candor to the Court requires counsel to timely notify the Court of requests to the PTO for institution of *inter partes* review when such request has the potential to affect the outcome of the concurrent litigation.

---

[12] The Court notes that Defendants separately opposed the motion for reconsideration through arguing that the motion was moot because none of the patent claims potentially affected by the PTAB's rulings are among those claims Plaintiff elected to assert at trial. Defs.' Opp. Mem. 13-14, ECF No. 465. While this is factually a true statement, it misses the potential indirect, but no less significant, impact that the instant motion could have on the trial, because some of the claims elected by VIS are dependent claims that rely on claims that were previously invalidated by this Court. Accordingly, as VIS correctly asserts, the reversal of such invalidation would necessarily impact the trial evidence Samsung would have to introduce in order to prove the invalidity of the dependent claim elected by VIS. Pl's Rebuttal Mem. 5, ECF No. 475. Thus, as the motion for reconsideration has the potential to impact the litigation of at least one of the claims Plaintiff has elected to assert at trial, the motion is not moot.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____ /s/ ⟨signature⟩

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 2 , 2014

45